**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROBERT RICHARDS, LARRY BOND,
KAREN BONKOSKI, LINDA BROZOWSKI,
ROSA FOX, AJIT PAI and MARY GRIFFOR,
Individually and on behalf of all similarly-situated
individuals,

        Plaintiffs,

v.

ADVANCED ACCESSORY SYSTEMS, LLC and
CASTLE HARLAN, INC., Jointly and Severally,

        Defendants.
_____/

Case No. 09-11418
Hon. Lawrence P. Zatkoff

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on September 30, 2010

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
                  UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter comes before the Court on Plaintiffs' motion for reconsideration [dkt 42], Plaintiffs' motion for partial summary judgment [dkt 43], Defendant Castle Harlan, Inc.'s motion for partial summary judgment [45], and Plaintiffs' motion to certify class [dkt 44]. Pursuant to E.D. Mich. L.R. 7.1(g)(2), Defendant is not permitted to respond to Plaintiffs' motion for reconsideration. Otherwise, the motions have been fully briefed. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. LR 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. The motions will be addressed in turn.

## II. BACKGROUND

Defendant Advanced Accessory Systems, LLC ("AAS") was a manufacturer of roof racks and side rails for the automotive original equipment manufacturing industry, providing approximately 50% of all the roof racks on cars in North America. AAS had facilities in Sterling Heights, Michigan, Port Huron, Michigan, and Shelby Township, Michigan. For reasons that are explained in greater detail below, on February 12, 2009, AAS informed its employees in each of the three locations that the facilities were closing and that, for the most part, they would all be laid off the following day. Plaintiffs, a putative class of former AAS employees, allege that AAS violated their rights under the Worker Adjustment Retraining Notification Act ("WARN Act"), 20 U.S.C. § 2010 *et seq.*, by failing to provide them with 60-days' notice of the plant closings. Plaintiffs also seek to hold Defendant Castle Harlan, Inc. ("Castle Harlan"), which maintains an ownership interest in AAS, liable for the alleged WARN Act violation. On June 26, 2009, AAS filed for bankruptcy in the Federal Bankruptcy Court for the Eastern District of Michigan, Case No. 09-60100-mbm, rendering Plaintiffs' WARN Act claims against AAS automatically stayed. Before discussing the events giving rise to the alleged WARN Act violation, the relationship between AAS and Castle Harlan must be explained.

Castle Harlan is a private equity investment firm headquartered in New York, which acts as an investment advisor to private equity funds. John Castle, Marcel Fournier and William Pruellage are employees of Castle Harlan, serving as Chairman, Senior Managing Director, and Managing Director, respectively. The private equity funds that Castle Harlan advises invest in middle-market companies, known in the industry as "portfolio companies," for the purpose of building and growing such companies for later sale as ongoing enterprises. According to Castle Harlan, a portfolio

company is a separate legal entity, whose day-to-day business is independently operated by its own management.

Here, Castle Harlan formed the private equity fund Castle Harlan Partner IV, L.P. ("CHP IV").[1] CHP IV owns 100% of Advanced Accessory Acquisitions, LLC, which owns 83% of CHAAS Holdings, LLC ("CHAAS"). CHAAS was the parent entity of AAS. Castle, Fournier and Pruellage were on CHAAS's board of directors.

The officers and executives operating and controlling AAS were Alan Johnson, CEO, and Clifford Suing, CFO, who was responsible for recruitment, staffing, benefits, employee relations, union relations, and AAS policies. Johnson was hired as CEO in 2005 by AAS's board of directors, members of which included Castle, Fournier and Pruellage. Lisa Suida was AAS's Human Resources Director and reported to Suing. None of these AAS officers held any position with Castle Harlan.

According to Castle Harlan, the CHAAS board of directors was in place to review AAS's finances and to understand the strategy for growing the business. The board was composed mainly of financial experts who had little-to-no automotive industry experience. Specifically, the CHAAS board would receive monthly status updates regarding AAS from Johnson and Suing, receive an annual independent audit of AAS, review strategy plans and budgets, and otherwise be kept apprised of material aspects of the business. Johnson and Suing typically met with Castle Harlan board members once a month to discuss AAS's finances.

Pursuant to a Management Agreement with CHAAS and AAS, Castle Harlan provided

---

[1]Following the close of discovery, Plaintiffs attempted to add CHP IV as a party defendant in this action. The Court issued an order denying Plaintiffs' request, which Plaintiffs now ask the Court to reconsider [dkt 42].

"business and organizational strategy, financial and investment management, advisory and merchant and investment banking services." Castle Harlan received management fees from AAS for these services. Castle Harlan was not, however, involved with the day-to-day operation of AAS. Specifically, Castle Harlan (1) played no role in meeting with customers or in seeking new or additional business, and (2) provided no administrative, human resources, or purchasing services, and did not have a role in the preparation of AAS personnel policies.

In 2007, AAS failed to meet financial benchmarks contained in the covenants with its major lender, Ableco. As a result, in early 2008, AAS renegotiated its covenants with Ableco, which involved CHP IV issuing letters of credit to support Ableco's loans to AAS. Due to the declining market in the auto industry in 2008, AAS took steps to cut back on its expenses, including ceasing payment of management fees to Castle Harlan pursuant to Ableco's requirements, slow-paying vendors and reducing approximately 15% of its salaried workforce. Johnson also began to seek buyers for AAS, with the intent to sell AAS as a going concern.

In late 2008, Johnson and his management team, which included Suing, prepared the 2009 AAS budget without assistance from Castle Harlan. Based on financial forecasts showing sufficient liquidity through the first quarter of 2009, Johnson and Suida shared the belief that AAS remained a viable business. However, in mid-January 2009, several major auto companies re-forecasted their volume predictions for the first quarter and first half of 2009, which forecasted a 20% decline over the production numbers AAS had previously received. AAS's updated projections forecasted liquidity concerns starting in March 2009. Also in mid-January, AAS provided Ableco with its 2008 financial results, which showed that AAS failed to meet its financial covenants to Ableco. Ableco responded by issuing a default notice for these failures, but permitted AAS to continue

4

operating pursuant to a forbearance agreement. Ableco also assumed control of AAS's bank accounts and determined which invoices would be paid.

At the suggestion of Ableco, and with the concurrence of Castle Harlan, AAS retained the consulting firm Conway MacKenzie ("Conway") to review its cash position, ensure AAS's liquidity forecast was accurate, work with AAS to develop a strategy to approach customers about obtaining financial support, and help market the company for sale as a going concern. Castle Harlan negotiated and approved the agreement between AAS and Conway prior to sending it to AAS for execution. AAS's retention of Conway was finalized on January 26, 2009, with AAS paying for Conway's services. Shortly after Conway's retention, each of AAS's board members resigned at the request of Castle Harlan, with Castle Harlan appointing one person to be the sole board member.

The primary Conway employee working with AAS was Steven Wybo, who communicated regularly with Fournier during his first two weeks and worked on-site at AAS in a conference room next to Johnson. Together, Conway and AAS developed a strategy to obtain an infusion of cash that would allow AAS to operate for an additional 90-120 days while a buyer was identified. Pursuant to Ableco's suggestion, AAS and Conway began considering bankruptcy protection as an alternative strategy for AAS.

On February 4, 2009, representatives of Conway, along with Johnson and Suing, attended a meeting with key customers, including General Motors, Ford, Chrysler, Toyota, and Nissan. The customers indicated at the meeting that they would discuss AAS's request for an infusion of capital with their management and continue to gather information. After the customer meeting, five of AAS's customers, which were responsible for 95% of AAS's business, decided to reject AAS's proposal and informed AAS that they were going to another source to obtain roof racks. According

5

to Johnson, it became clear to him at that time that AAS was no longer a viable business.

On February 11, 2009, Johnson made the decision to lay off the majority of AAS's employees, effective February 13, 2009, and to wind up the business. On February 12, 2009, Johnson orally notified AAS's employees that the company was closing and that most employees would be laid off the following day. According to Johnson, Castle Harlan representatives were not present during these discussions, and Castle Harlan did not direct or advise Johnson or AAS to layoff employees or close any plants.

### III. LEGAL STANDARD

**A.   RECONSIDERATION**

Local Rule 7.1(g)(3) governs motions for reconsideration, stating that "the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication." E.D. Mich. L.R. 7.1(g)(3). The same subsection further states, "the movant must not only demonstrate a palpable defect by which the court and the parties have been misled but also show that correcting the defect will result in a different disposition of the case." *Id.* A defect is palpable when it is obvious, clear, unmistakable, manifest, or plain. *Mktg. Displays, Inc. v. Traffix Devices, Inc.*, 971 F. Supp. 262, 278 (E.D. Mich. 1997).

**B.   SUMMARY JUDGMENT**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001). The moving party bears the initial

burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325).

Once the moving party has met its burden of production, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

### A. MOTION FOR RECONSIDERATION

On May 27, 2009, the Court issued a notice to appear, in which the Court ordered the parties to submit a case summary report indicating the parties' intentions to amend their pleadings or add parties. None of the parties expressed an intention to amend their pleadings in order to add any parties. During the scheduling conference held on July 9, 2009, the parties were again asked whether they wished to amend the pleadings or add parties. Once more, none of the parties

7

expressed an intention to add any parties. At that time, the Court stated that no amendments would be permitted and that no additional parties may be added. After the close of discovery, and several weeks prior to the dispositive motion deadline, the parties submitted a stipulated order to amend the complaint to add CHP IV as a defendant in this case. The Court then issued an order denying the parties' request to add CHP IV as a defendant on the basis that such request was untimely. Plaintiffs now ask the Court to reconsider that order [dkt 42]. However, Plaintiffs have failed to identify a palpable defect in the Court's previous order. Accordingly, the Court denies Plaintiffs' motion for reconsideration.

**B. WARN ACT: CROSS MOTIONS FOR SUMMARY JUDGMENT**

The WARN Act requires certain employers to provide employees or their representatives with 60 days' advance notice of a proposed plant closing or mass layoff. 29 U.S.C. § 2101(a). The WARN Act defines an employer as "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)." 29 U.S.C. § 2101(a)(1). Here, there is no dispute that Plaintiffs were employed by AAS, and not Castle Harlan. Accordingly, the Court must examine the extent to which an entity with a controlling ownership interest in an employer is subject to WARN Act liability based on the employer's conduct.

According to Department of Labor ("DOL") regulations relating to WARN Act liability, "subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(2). A parent company is liable for a subsidiary's WARN Act violations when the two entities constitute a single business enterprise. *See*

*In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 243-44 (3rd Cir. 2008) (citing 20 C.F.R. § 639.3(a)(2)). Whether a parent company and its subsidiary constitute a single business enterprise depends on the following factors: "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. § 639.3(a)(2).

While the Sixth Circuit has not examined the issue of whether a parent company may be held liable for a subsidiary's alleged WARN Act violation, other circuits have addressed the issue. In *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 489-90 (3rd Cir. 2001), the court "conclude[d] that the most prudent course [in determining parent liability] is to employ the factors listed in the Department of Labor regulations themselves. This approach not only has the virtue of simplicity . . . but also allows for the creation of a uniform standard of liability for the enforcement of a federal statute." *Pearson* has been followed by other circuits and is frequently cited by district courts, including ones in this Circuit, when deciding questions of parent or affiliate liability under the WARN Act. *See Smith v. Ajax Magnathermic Corp.*, 144 Fed. Appx. 482, 484 (6th Cir. 2005) (applying DOL factors, and citing *Pearson*, when considering WARN Act liability in the lender/creditor context); *Administaff Cos. v. N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457 (6th Cir. 2003) (applying DOL factors, and citing *Pearson*, when considering WARN Act liability in an employer/independent contractor context); *Guippone v. BH S&B Holdings LLC*, No. 09 Civ. 1029 (CM), 2010 U.S. Dist. LEXIS 50482, at *12-13 (S.D.N.Y. May 18, 2010) (applying DOL factors to determine whether the defendants constituted a single entity subject to WARN Act liability); *UAW, Local 157 v. OEM/Erie Westland, LLC*, 203 F. Supp. 2d 825, 833 (E.D. Mich. 2002) (applying DOL factors as set forth in *Pearson* for a WARN Act claim in the parent/subsidiary

9

context). Both parties in this case also agree that Castle Harlan's liability should be analyzed under the DOL factors, as stated in *Pearson*. Accordingly, the Court shall analyze Castle Harlan's WARN Act liability pursuant to the factors set forth in the DOL regulations.

### 1. Common Ownership and Common Directors and/or Officers

It is undisputed that the first two DOL factors weigh in favor of Plaintiffs. With respect to factor one, common ownership, Castle Harlan, through CHP IV, Advanced Accessory Acquisitions, LLC, and CHAAS, maintained an ownership interest in AAS. With respect to factor two, common directors and/or officers, Fournier was a director of Castle Harlan and served on AAS's board of directors. Likewise, Pruellage and Castle were officers with Castle Harlan and maintained positions on AAS's board of directors.

However, the Court notes that the DOL factors "are not balanced equally: the first and second factors, common ownership and common directors and/or officers, are not sufficient to establish that two entities are a 'single employer.'" *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d at 243 (citing *Pearson*, 247 F.3d at 494) ("[O]wnership—and even ownership coupled with common management—is not a sufficient basis for liability."). "Thus, [these] factor[s] counsel[] in favor of liability for . . . [D]efendant[] but [are] also of limited importance." *Guippone*, 2010 U.S. Dist. LEXIS 50482 at *15. *See also Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 142 (S.D.N.Y. 2004) ("It is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary. Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, it cannot be enough [in and of itself] to establish liability.") (citing *United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998)).

## 2. De Facto Exercise of Control

The focus of this factor is upon whether the parent company "was the decision-maker responsible for the employment practice giving rise to the litigation." *Pearson*, 247 F.3d at 503-04. Here, a review of the facts indicate that while Castle Harlan provided AAS with financial support and advice and played an important role in helping AAS stay afloat, Castle Harlan played no role in the decision to close the AAS plants without giving advance notice to AAS employees. According to the unrebutted testimony of Johnson, AAS's CEO, *he* made the decision to close AAS's plants after *he* determined that AAS was no longer a viable business. *See In re APA Transp. Corp. Consol. Litig.*, 541 F.3d at 245 (finding no de facto exercise of control where affiliated company made loans to an employer and shared administrative functions with the employer, but the affiliated company "played no role in [the employer's] decision to close its facilities"); *Pearson*, 247 F.3d at 504 (finding no de facto exercise of control where the parent generally monitored the subsidiary, the parent's approval was required for a number of projects involving the subsidiary's finances and budgeting, and the subsidiary closed as a result of the parent's decision to call loans made to the subsidiary).

Plaintiffs contend that de facto exercise of control existed because AAS was financially dependant on Castle Harlan, but Plaintiffs offer no legal authority standing for the position that de facto control over the employment practice giving rise to the litigation can be proven merely by financial dependence. Although Castle Harlan played a major role in attempting to ensure AAS's financial stability, Plaintiffs have failed to present evidence showing that Castle Harlan exercised control over the decision to close the plant. To the contrary, the evidence presented suggests that Castle Harlan expended significant effort in attempting to prevent such an outcome. The fact that

Castle Harlan's efforts with respect to AAS's finances proved unsuccessful had little to do with the employment practice giving rise to this litigation, *i.e.*, closing AAS plants without giving the required notice to AAS employees. Accordingly, the Court finds that this factor weighs in favor of Castle Harlan.

### 3. Unity of Personnel Policies Emanating from a Common Source

The focus of this factor is "whether the companies actually functioned as a single entity with regard to [their] relationship [] with employees," which involves an analysis of "whether the two companies in question engaged in centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping." *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d at 245 (citations omitted). Here, the unrebutted testimony of Johnson, Suida, and Suing indicates that Castle Harlan and AAS did not share any personnel policies. Plaintiffs have presented no evidence that the companies engaged in centralized hiring and firing, payment of wages, or personnel and benefits recordkeeping. While Plaintiffs argue that Castle Harlan was intimately involved with the decisions that led to the financial failure of AAS, this type of evidence is not probative as to this factor. *See Pearson*, 247 F.3d at 500 (finding that evidence relating to the decision to close a plant is not part of the unity of personnel policy analysis). Furthermore, the Court finds that Castle Harlan's control over the hiring of AAS's officers, directors and high level managers is alone insufficient to find a unity of personnel policies. *See id.* ("[T]he fact that GECC may have controlled the hiring and firing of the company's president and chief executive officer, and monitored the hiring of a few other high-level managers . . . simply is not enough to find a 'unity' of personnel 'policy.'"). Thus, the Court finds that this factor weighs in favor of Castle Harlan.

### 4. Dependence of Operations

To determine whether two companies are dependent on one another, courts look to the "existence of arrangements such as the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingled finances." *Pearson*, 247 F.3d at 500 (citations omitted). "[D]ependency of operations cannot be established by the parent corporation's exercise of its ordinary powers of ownership, i.e., to vote in directors and set general policies." *Id.* at 501 (citation omitted).

Here, Plaintiffs have presented no evidence that Castle Harlan and AAS shared administrative or purchasing services or interchanged employees or equipment. Instead, Plaintiffs argue that dependency of operations existed because AAS was dependent on Castle Harlan for monetary support, and that AAS was not able to operate without Castle Harlan. Plaintiffs cite solely to *Pearson* in support of their financial dependency argument. However, *Pearson* held that financial assistance given by a parent to a subsidiary in order to keep the subsidiary afloat and return it to profitability "cannot be sufficient to satisfy this prong." *Id.* at 503 ("We surely do not want to discourage companies from attempting to keep their subsidiary operations afloat with temporary loans by holding that the mere fact that loans were even necessary establishes a 'dependency of operations' giving rise to liability.").

Furthermore, Plaintiffs provide no support for their contention that AAS could not operate without Castle Harlan. The Court agrees that, with respect to AAS's finances, Plaintiffs may be correct in their assertion. However, the evidence suggests that, aside from financial advice and assistance, AAS operated its day-to-day functions independent from Castle Harlan, which only monitored AAS from a financial investment standpoint. Therefore, the Court finds that this factor

weighs in favor of Castle Harlan.

**5. Conclusion**

As only factors one and two favor Plaintiffs in this matter, and such factors are alone insufficient to establish that Castle Harlan and AAS constituted a single business enterprise, the Court finds that Plaintiffs have failed to demonstrate that Castle Harlan is subject to WARN Act liability for AAS's alleged failure to notify its employees of the plant closings. Significant to the Court's decision was Castle Harlan's primary role as investor with respect to AAS. Castle Harlan's management of AAS was limited to ensuring its financial success and played no part in the day-to-day operations of AAS. The common officers and directors had little-to-no experience with the automotive industry, and the decision to close the plants was made by AAS's CEO, who did so without advice or encouragement from Castle Harlan. *See Pearson*, 247 F.3d at 505 ("Though GECC . . . monitored much of the activity at CompTech, there is no question that at all times CompTech . . . did not rely on GECC to supply it with personnel, equipment, facilities, clients, administrative services, or any of the other various resources typically 'shared' between companies that are ultimately found liable for each others' debts."). The retention of Conway further emphasizes Castle Harlan's limited role with respect to AAS; when AAS encountered severe difficulties due to the declining automobile industry, it was apparently clear to both Ableco and AAS that Castle Harlan was ill-equipped to manage AAS aside from financial and banking issues, thus necessitating Conway's retention.

Furthermore, the Court finds that the authority cited by Plaintiffs is factually distinguishable from the present case. *See In Re Shelby Yarn Company*, 306 B.R. 523 (W.D. N.C. 2004) (allowing WARN Act claim to proceed against investment company where such company (1) was intricately

involved in decisions relating to the employer's competition, products, patents, internal company communications, and every decision affecting the employer, (2) made the decision to close a plant, and (3) carried out the plant closing); *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 146 (S.D.N.Y. 2004) (allowing WARN Act claim to proceed where parent company left the day-to-day functioning of the business to the subsidiary, but where the decision to affect plant closings resided in the hands of the parent corporation, which possessed and exercised its authority to order the subsidiary to petition for bankruptcy and close its facilities); *Geelan v. Mark Travel, Inc.*, No. 03-6322, 2006 WL 3610804, at *4 (D. Minn. Dec. 11, 2006) (denying motion for summary judgment where employer's corporate affiliate was responsible for over 80% of the employer's business and there was an interchange of employees); *UAW, Local 157 v. OEM/Erie Westland, LLC*, 203 F. Supp. 2d 825, 834-35 (E.D. Mich. 2002) (allowing WARN Act claims to proceed where the defendant told the employer to shut down its plant, controlled some components of the business, such as the type of accounting and computer systems, and then terminated the plant's operations by pulling the plug on its computer systems).

Accordingly, Plaintiffs' motion for partial summary judgment under the WARN Act is denied, and Castle Harlan's motion is granted.

## C. MOTION TO CERTIFY CLASS

Having dismissed Plaintiffs' claims against Castle Harlan and stayed Plaintiffs' claims against AAS, the Court finds that Plaintiffs' motion for class certification is denied as moot.

## V. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Plaintiffs' motion for reconsideration [dkt 42] is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motion for partial summary judgment [dkt 43] is DENIED.

IT IS FURTHER ORDERED that Castle Harlan's motion for partial summary judgment [dkt 45] is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' motion to certify class [dkt 44] is DENIED.

Plaintiffs' claims against AAS shall continue to be stayed pending resolution of AAS's bankruptcy proceedings.

IT IS SO ORDERED.

                         S/Lawrence P. Zatkoff
                         LAWRENCE P. ZATKOFF
                         UNITED STATES DISTRICT JUDGE

Dated: September 30, 2010

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on September 30, 2010.

                         S/Marie E. Verlinde
                         Case Manager
                         (810) 984-3290